CUAUHTEMOC ORTEGA (Bar No. 257443)
Federal Public Defender
ERIN MURPHY (Bar No. 285087)
(E-Mail: Erin_Murphy@fd.org)
FERMIN C. VARGAS (Bar No. 312308)
(E-Mail: Fermin_Vargas@fd.org)
Deputy Federal Public Defenders
321 East 2nd Street
Los Angeles, California 90012-4202
Telephone: (213) 894-5310
Facsimile: (213) 894-0081

Attorneys for Defendant
DANIEL GARCIA

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>DANIEL GARCIA,<br><br>Defendant. | Case No. 2:21-cr-365-JFW<br><br>**NOTICE OF MOTION AND MOTION TO SUPPRESS PROCEEDS OF UNLAWFUL SEIZURE, SEARCH, QUESTIONING AND SEARCH WARRANTS; EXHIBITS; DECLARATION OF COUNSEL; DECLARATION OF DANIEL GARCIA**<br><br>**Date: February 14, 2022**<br>**Time: 8:00am** |

TO INTERIM UNITED STATES ATTORNEY TRACY WILKISON AND ASSISTANT

UNITED STATES ATTORNEY JENA A. MACCABE:

PLEASE TAKE NOTICE that on February 14 at 8:00 am, in the courtroom of

the Honorable John F. Walter, United States District Judge, or as soon thereafter as

counsel may be heard, defendant Daniel Garcia, by and through his counsel of record,

Deputy Federal Public Defenders Erin Murphy and Fermin Vargas, will bring on for

hearing the following motion:

## MOTION

By and through his attorneys of record, Deputy Federal Public Defenders Erin Murphy and Fermin C. Vargas, Daniel Garcia hereby moves this Honorable Court for an order suppressing evidence and statements obtained from the unconstitutional search, seizure, and questioning of Mr. Garcia on July 2, 2021, as well as the fruits of those constitutional violations.  He further moves this Honorable Court for an order suppressing the proceeds of the unconstitutional search warrants issued here.  This motion is made under the Fourth and Fifth Amendments to the United States Constitution and is based on the attached Memorandum of Points and Authorities, exhibits, declarations, all files and records in this case, and any additional evidence and argument presented at or before the hearing on this motion.

Respectfully submitted,

CUAUHTEMOC ORTEGA
Federal Public Defender

DATED: January 3, 2021          By   */s/ Erin Murphy*

ERIN MURPHY
FERMIN C. VARGAS
Deputy Federal Public Defenders
Attorneys for DANIEL GARCIA

# **TABLE OF CONTENTS**

I.   BURBANK POLICE PULLED MR. GARCIA OVER FOR MINOR TRAFFIC VIOLATIONS, AND PROMPTLY BEGAN TO SEIZE, SEARCH, AND INTERROGATE HIM AGAINST HIS RIGHTS.....................1

   A.   Burbank Police Officers Follow Mr. Garcia From Hotel Until They Pull Him Over for Pretextual Stop for Minor Traffic Violations. ...............1

      1.   Officer Timlin Illegally Frisked Mr. Garcia When There Was No Indication He Was Armed or Dangerous. ...................................2

      2.   During the Illegal and Fruitless Body Search, the Officers Ask Incriminating Questions Unrelated to the Traffic Stop....................3

      3.   Based on Mr. Garcia's Illegally Obtained Admissions, Officer Timlin Searches the Car. ................................................5

II.  THE ITEMS SEIZED FROM THE PROLONGED DETENTION, ILLEGAL FRISK AND MIRANDA VIOLATIONS SHOULD BE SUPPRESSED. ...........6

   A.   The government must prove that the warrantless detention of Mr. Garcia, the subsequent searches of Mr. Garcia, the car, and his wallet and satchel were constitutionally valid. ........................................6

   B.   Mr. Garcia was unlawfully detained, questioned, and searched in violation of the Fourth Amendment..............................................8

      1.   The Officers exceeded the scope of a proper traffic stop when they seized Mr. Garcia, searched him, interrogated him, and investigated far beyond the scope of the minor traffic violations. ....8

      2.   A *Terry* frisk was not justified because there was no reasonable suspicion that Mr. Garcia was armed or dangerous. ......................11

      3.   The Officers far exceeded the scope of any legitimate *Terry* frisk .............................................................12

   C.   The Officers Unlawfully searched Mr. Garcia's car .................................13

      1.   The Officers would have had no occasion to search Mr. Garcia's car but-for their earlier constitutional violations............................13

      2.   Mr. Garcia did not give valid consent to search his car .................15

   D.   The Officers Unlawfully Seized and Searched Mr. Garcia's Belongings...........................................................17

      1.   The Officers had no legal basis to seize and search Mr. Garcia's Wallet and Satchel. .........................................17

      2.   The unlawful *Terry* frisk tainted any purported consent to search his belongings, and any consent was involuntary...........................18

i

E.    Mr. Garcia was interrogated in violation of his Fifth Amendment rights. ...................................................................................................... 19

F.    The proceeds of the unlawful searches and seizures, and the fruit of those proceeds, must be excluded. ............................................................ 20

III.    THE CELL PHONES SHOULD BE SUPPRESSED BECAUSE THE AGENT OBTAINED THEM THROUGH PROHIBITED GENERAL SEARCH WARRANTS. ..................................................................... 20

A.    Even if the warrants stated some degree of probable cause, they were so unparticularized and overbroad that they became general warrants because they allowed the government to search the entire phones without any limits to their discretion. ......................................................... 21

ii

# Table of Authorities

Page(s)

Federal Cases

*Adams v. Williams*,
   407 U.S. 143 (1972) ......................................................................................... 13

*Andresen v. Maryland*,
   427 U.S. 463 (1976) ......................................................................................... 22

*Aquino v. Cnty. of Monterey Sheriff's Dept.*,
   2016 WL 5946867 (N.D. Cal. Sept. 29, 2016) .................................................. 17

*Arizona v. Johnson*,
   555 U.S. 323 (2009) ......................................................................................... 11

*Brown v. Illinois*,
   422 U.S. 590 (1975) ......................................................................................... 14

*Franks v. Delaware*,
   438 U.S. 154 (1978) ......................................................................................... 21

*Illinois v. Perkins*,
   496 U.S. 292 (1990) ......................................................................................... 19

*In re Grand Jury Subpoena, JK-15-029*,
   828 F.3d 1083 (9th Cir. 2016) .......................................................................... 22

*J.D.B. v. North Carolina*,
   564 U.S. 261 (2011) ......................................................................................... 19

*Jones v. United States*,
   357 U.S. 493 (1958) ........................................................................................... 7

*Matter of the Search of Info. Associated with [redacted]@mac.comthat is
   Stored at Premises Controlled by Apple, Inc.*,
   25 F. Supp. 3d 1 (D.D.C. 2014) ....................................................................... 24

*Matter of Search of Info. Associated With Four Redacted Gmail Accts.*,
   371 F. Supp. 3d 843 (D. Or. 2018) ................................................................... 23

*Miranda v. Arizona*,
   384 U.S. 436 (1966) .................................................................................... 19, 20

*Ramirez v. City of Buena Park*,
 560 F.3d 1012 (9th Cir. 2009)............................................................................ 11

*Rhode Island v. Innis*,
 446 U.S. 291 (1980)............................................................................................ 20

*Riley v. California*,
 573 U.S. 373 (2014)..................................................................................... 22, 23

*Rodriguez v. United States*,
 135 S. Ct. 1609 (2015)................................................................................... 8, 13

*Terry v. Ohio*,
 392 U.S. 1 (1968)............................................................................................... 11

*Thompson v. Keohane*,
 516 U.S. 99 (1995)............................................................................................. 19

*United States v. Carbajal*,
 956 F.2d 924 (9th Cir. 1992)............................................................................... 7

*United States v. Castillo*,
 866 F.2d 1071 (9th Cir. 1989)........................................................................... 15

*United States v. Chan-Jimenez*,
 125 F.3d 1324 (9th Cir. 1997)..................................................................... 10, 15

*United States v. Collier*,
 2015 WL 11123302 (C.D. Cal. Nov. 10, 2015) ................................................ 18

*United States v. Comprehensive Drug Testing, Inc.*,
 621 F.3d 1162 (9th Cir. 2010) (en banc) (per curiam) ...................................... 23

*United States v. Cornejo*,
 196 F. Supp. 3d 1137 (E.D. Cal. 2016)............................................................. 10

*United States v. Curtis*,
 568 F.2d 643 (9th Cir. 1978)............................................................................. 16

*United States v. Davis*,
 332 F.3d 1163 (9th Cir. 2003)........................................................................... 17

*United States v. Emens*,
 649 F.2d 653 (9th Cir. 1980)............................................................................... 7

i

*United States v. Evans*,
    786 F.3d 779 (9th Cir. 2015)............................................................................... 8

*United States v. Flores*,
    802 F.3d 1028 (9th Cir. 2015)................................................................... 23, 25

*United States v. Harrison*,
    34 F.3d 866 (9th Cir. 1994)............................................................................. 19

*United States v. Hill*,
    459 F.3d 966 (9th Cir. 2006)............................................................................ 22

*United States v. Huguez-Ibarra*,
    954 F.2d 546 (9th Cir. 1992)............................................................................. 7

*United States v. I.E.V.*,
    705 F.3d 430 (9th Cir. 2012)................................................................. 11, 12, 13

*United States v. Kim*,
    292 F.3d 969 (9th Cir. 2002)............................................................................ 19

*United States v. Landeros*,
    913 F.3d 862 (9th Cir. 2019)..................................................................... 14, 19

*United States v. Lofstead*,
    2021 WL 5501101 (D. Nev. Nov. 22, 2021)......................................... 25, 26, 27

*United States v. Mendenhall*,
    446 U.S. 544 (1990)........................................................................................ 15

*United States v. Morales*,
    252 F.3d 1070 (9th Cir. 2001).......................................................................... 10

*United States v. Roberts*,
    430 F. Supp. 3d 693 (D. Nev. 2019) ........................................................... 22, 24

*United States v. Robertson*,
    833 F.2d 777 (9th Cir. 1987)............................................................................ 12

*United States v. Shaibu*,
    920 F.2d 1423 (9th Cir. 1990).......................................................................... 15

*United States v. Stephens*,
    206 F.3d 914 (9th Cir. 2000)............................................................................ 15

*United States v. Vasquez*,
  2021 WL 3011997 (9th Cir. July 15, 2021) ........................................................ 9

*United States v. Ventresca*,
  380 U.S. 102 (1965) ........................................................................................ 6

*United States v. Ward*,
  2017 WL 1549474 (N.D. Cal. May 1, 2017) ..................................................... 10

*United States v. Washington*,
  490 F.3d 765 (9th Cir. 2007) ............................................................. 14, 15, 19

*Virginia v. Moore*,
  553 U.S. 164 (2008) ........................................................................................ 22

*Wofford v. Bracks*,
  2016 WL 8732178 (C.D. Cal. Jul. 26, 2016) ..................................................... 17

*Wong Sun v. United States*,
  371 U.S. 471 (1963) ........................................................................ 7, 10, 20, 22

**State Cases**

*In re Johnny O.*,
  107 Cal. App. 4th 888 (2003) ........................................................................... 9

**U.S. Constitution**

U.S. Const. amend IV .......................................................................................... 2

U.S. Const. amend V ........................................................................................ 2, 19

U.S. Const. amend XIV .............................................................................. *passim*

## MEMORANDUM OF POINTS AND AUTHORITIES

## I. BURBANK POLICE PULLED MR. GARCIA OVER FOR MINOR TRAFFIC VIOLATIONS, AND PROMPTLY BEGAN TO SEIZE, SEARCH, AND INTERROGATE HIM AGAINST HIS RIGHTS.[1]

**A.  Burbank Police Officers Follow Mr. Garcia From Hotel Until They Pull Him Over for Pretextual Stop for Minor Traffic Violations.**

On July 2, 2021, around 7pm, Burbank Police Officers Timlin and Martinez were working a full uniform patrol in a marked Burbank Police Patrol car near the Quality Inn hotel at 2255 North Buena Vista St. (*See* Ex. A, Incident Report at USAO_10.)   According to the Incident Report, the Officers saw a blue Chrysler sedan leave the hotel and turn onto Buena Vista. (*Id*.)  The Officers believed that the "front windows were tinted" illegally and that the car made an illegal right turn.[2] (*Id.*)  The car immediately signaled and crossed over to the far-right lane, stopping at the right-hand curb next to a bank, in a red zone. (Ex. F, Dashcam Footage, at :30-:40.)

The Officers pulled up behind the car.  (Ex. F at 1:05-:20.)  Officer Timlin was driving. (*Id*.)  Officer Timlin says, "He's got a cigarette in his mouth," and Officer Martinez says, "Oh, he just looks dirty." (*Id.* at :52-:54; Ex. F-1 at 1.)

As Officer Timlin opens his door, he hollers to Mr. Garcia to put down his back windows because they are dark.  (*See* Ex. F-1 at 1.)  Officer Martinez approaches the front passenger side door and speaks to Mr. Garcia through the open window. (*See* Ex. H-1 at 1.)  Officer Martinez asks Mr. Garcia for a license and to turn the car off.  (Ex. H

---

[1] Relevant body and dash cam footage disclosed by the government are attached here as separate exhibits.  Because of the number of exhibits, an index is included.

Where audio from an exhibit is cited herein, a timestamped transcript is also available and attached as an extension of that exhibit.  In citing conversations, the defense cites to the transcripts here. These transcripts were generated by Rev.com, an automatic transcript generating service.  Each transcript was reviewed against the original audio.  Because of the poor audio quality in some portions of the files, there were several instances where the audio was inaudible or certain words appeared incorrectly captured, which were corrected where possible.

[2] By citing to the Incident Report, the defense does not concede that the incident report accurately describes what occurred.  Rather, the defense cites to the report to provide background and context for what is depicted in the footage from the body and dashboard cameras.

at 1:07.)  Mr. Garcia calmly asks why he was pulled over and Officer Martinez explains why.  (*Id*.)  Before Mr. Garcia is able to further respond to Officer Martinez,[3] Officer Timlin approaches the driver's side.  (Ex. G, USAO_000006 TRAFFIC_STOP-4.mp4, Timlin Body Cam at 1:13 -:16.)  The back window is open about a third of the way. (*Id.* at 1:13-:16.)  Officer Timlin pauses at the rear left passenger side window for, at most, a few seconds before continuing to the driver's window.  (*Id*.)

### 1.    Officer Timlin Illegally Frisked Mr. Garcia When There Was No Indication He Was Armed or Dangerous.

At the driver's window, Officer Timlin asks Mr. Garcia to put his cigarette out. (Ex. G-1 at 1.)  As Mr. Garcia complies, Officer Timlin says, "Can you step out of the car for me?" (*Id*.)  Mr. Garcia asks, "Okay. For what reason?" Officer Timlin replies, "I'll tell you when you get out of car." (*Id*.)

As Mr. Garcia calmly exits the car, Officer Timlin asks, "Just marijuana in the car?" (*Id*.)  Mr. Garcia replies "No, I don't have no marijuana." (*Id*.)  Officer Timlin retorts, "No? You've got bongs and stuff."  (*Id*.)  Mr. Garcia's response is cut off by Officer Timlin telling him that he can leave his "stuff there," referring to the wallet in his hands and the satchel around his body.  (*Id*.; Ex. G at 1:33-:38.)

But as Mr. Garcia stands up, and before he can put his belongings in the car, Officer Timlin grabs Mr. Garcia's hand, tells him to turn around, grabs the other hand, and puts Mr. Garcia facing forward.  (Ex. G at 01:39-01:43.)  He tells Mr. Garcia to put his "palms together." (Ex. G at 01:42-01:43; Ex. G-1 at 2.)  As Officer Timlin takes the wallet from Mr. Garcia's hands and gives it to Officer Martinez, he restrains Mr. Garcia's hands.  (Ex. G at 1:44-1:46.)

Officer Timlin again orders Mr. Garcia to put his "palms together" for him. (Ex. G-1 at 2.)  Officer Timlin, restraining Mr. Garcia from behind, closes the driver's side

---

[3] It is not until after Officer Timlin illegally and repeatedly frisks Mr. Garcia and the Officers ask incriminating questions that Officer Martinez actually looks for a driver's license.

door and orders Mr. Garcia to "go over here" signaling to the sidewalk. (*Id.*; Ex. G at 1:50-:54.)  Together, the Officers take Mr. Garcia to the curb.

Officer Timlin asks "Anything on you that's going to stick me, poke me, or hurt me?" (Ex. G-1 at 2.)  Mr. Garcia replies "No, not that I know of." (*Id.*)  His hands are still restrained behind his back.  The Officers remove Mr. Garcia's satchel. (Ex. G at 2:00-:10.)  Officer Timlin begins running his hands over Mr. Garcia.  (*Id* at 2:10-:20.)  This includes feeling the outside of his clothing, and even lifting Mr. Garcia's tank top. (*Id.*)  He again asks "Anything going to hurt me?" (*Id.*; Ex. G-1 at 2.)

While continuing to search Mr. Garcia over his clothes, and even though Mr. Garcia already said "no," Officer Timlin again asks, "Nothing's going to hurt me?" (Ex. G-1 at 2-3.)  Mr. Garcia says, "No." (*Id* at 3*.)  Even though he had already begun doing so, Officer Timlin asks Mr. Garcia, "Okay, I can search you?" (*Id.*)  Mr. Garcia does not respond. (*Id.*)  Officer Timlin continues to search Mr. Garcia by running his hands over his clothes. (Ex. G at 2:10-:20.)  Officer Timlin asks Mr. Garcia, for the third time, "anything going to hurt me?" and Mr. Garcia responds "No, told you no." (Ex. G-1 at 3.)

### 2. During the Illegal and Fruitless Body Search, the Officers Ask Incriminating Questions Unrelated to the Traffic Stop.

The Officers continue asking him incriminating questions without *Miranda* warnings.  Holding the satchel and wallet, Officer Martinez asks, "Anything illegal in this stuff?"[4] (Ex. G, at 02:10-:12; Ex. G-1 at 2.)  Mr. Garcia says "no."  Officer Martinez asks, "can I check?"  Mr. Garcia says "go for it." (Ex. G-1 at 2.)  Officer Martinez does not immediately search the satchel. (*See* Ex. G, at 02:10-:14)

Officer Timlin, still searching Mr. Garcia and without any reason to suspect he is armed and dangerous, changes his approach.  He asks "nothing illegal in here?"  Mr. Garcia responds, "yeah."  Timlin asks, "what do you have?" and Mr. Garcia tells him

---

[4] The video shows Mr. Garcia facing Officer Martinez, and thus, it seems that Mr. Garcia is responding to Officer Martinez.

1 that, "I have a stem on me." (Ex. G-1 at 3.)  Officer Timlin then asks him if "that's it?"

2 Mr. Garcia says, "yeah."  (*Id*.)  Officer Timlin says, "Okay. You're not under arrest yet.

3 Just relax." (*Id*.)  Mr. Garcia indicates that the pipe is for methamphetamine.  (*Id*.)

4 Although Officer Timlin had told Mr. Garcia that he was "not under arrest yet,"

5 he handcuffs Mr. Garcia moments after learning about the pipe. (Ex. G at 2:35-:50.)

6 Officer Timlin continues to question Mr. Garcia; what brought him to Burbank,

7 who he was with, and where he is from, which Mr. Garcia interprets to be a question

8 about gang membership.  (Ex. G at 2:52-3:17; Ex. G-1 at 4.)  Returning to the pipe,

9 Officer Timlin asks Mr. Garcia, "this pocket right here," signaling to the right pocket

10 and Mr. Garcia replies, "yeah." (Ex. G at 03:16-:18; Ex. G-1 at 4.)  Officer Timlin pulls

11 out what appear to be chapstick, and a glass pipe.  (Ex. G at 3:18-:21.)

12 Officer Timlin tells Mr. Garcia, who is already handcuffed, to sit on a ledge of

13 the bank building, farther from the car. (Ex. G at 3:37; Ex. G-1 at 5.)  Officer Martinez

14 asks Mr. Garcia if he has a license. (Ex. G at 3:40-:42; Ex. G-1 at 5.)  Mr. Garcia's

15 response is somewhat indiscernible in the audio, but he appears to say something about

16 his passport. (Ex. G at 3:43; Ex. H at 3:40-:43.) While Mr. Garcia is seated and cuffed,

17 Officer Martinez continues to interrogate him, asking questions like whether he was on

18 probation or parole and the last time he was arrested. (Ex. H-1 at 4.)

19 Still without *Miranda* warnings, Officer Timlin asks Mr. Garcia "nothing crazy

20 in your car, right man?" (Ex. G-1 at 6.)  Mr. Garcia says "no." (*Id*.)  Mr. Garcia adds

21 that, "someone had took my car today." (*Id*.)  Officer Timlin asks, "Oh, so there might

22 be some stuff in there that doesn't belong to you?" (*Id*.)  Mr. Garcia says that he was

23 just letting them know, and that he found the car today.  (*Id*.)  Officer Timlin asks Mr.

24 Garcia, "is it okay if I check?"  (*Id*.)  Mr. Garcia replies, "Yeah, go for it."  (*Id*.)

25 While Officer Timlin begins searching the car, Officer Martinez calls Mr.

26 Garcia's information into dispatch, and then continues to ask him questions like how

27 long he had been using drugs, whether the car was his, what had happened to it the

28 night before, and who was at the hotel. (Ex. H-1 at 5-7.)  When Mr. Garcia asks to call

his husband, the owner of the car, Officer Martinez interrupts, takes out a card, and begins reading Mr. Garcia his *Miranda* rights.  (Ex. H at 07:47-08:00; Ex. H-1 at 7-8.)  Officer Martinez questions Mr. Garcia about a rolled up piece of foil he found in the satchel, and he admits it contains cocaine.  (Ex. H at 8:11-:33; Ex. H-1 at 8.)

### 3.   Based on Mr. Garcia's Illegally Obtained Admissions, Officer Timlin Searches the Car.

While Officer Martinez continued questioning Mr. Garcia, Officer Timlin had begun to search the car.  (Ex. G at 4:55.)  When he started, he did not go to the back left passenger seat, where the Incident Report later claims he saw a "glass bong" with white crystal-like residue "consistent with methamphetamine" in plain view.  (Ex. A at 3.)  Instead, he searched the driver's side compartment.  (*Id*. at 4:51-06:01.)  There, he found a Tupperware with what appeared to be a white, opaque substance, papers, cash, and a glass pipe.  (*Id*. at 6:00-7:13.)

Eventually, Officer Timlin opens the rear left door to the backseat.  Contrary to what the report states, screenshots from Officer Timlin's body cam do not immediately appear to show any bong in plain view on the back seat.  (Ex. G-2, Screenshots.)  He rifles through the lower left door compartment.  (Ex. G at 7:20-:25.)  Then, he searches a bag sitting in the left backseat.  (*Id*. at 7:26.)  There, he finds cash and baggies with what appeared to be a white substance as well as some credit cards and other documents.  (*Id*. at 7:36-8:13.)  Officer Timlin then appears to lean forward into the rear compartment, and there is a clicking sound.  Moments later, a translucent green glass item, a bong, appears.  (*Id*. at 8:14-:21.)

After the Officers discuss their findings, Officer Martinez places Mr. Garcia in the backseat of the police car.  (Ex. H at 9:10-:50.)

Officer Timlin continues searching the floor of the car where he finds a cell phone.[5]  (Ex. G at 10:56-11:16.)  On the passenger side, Officer Martinez finds what he

---

[5] In total, the Officers seize four cellular phones.  (Ex. C at 1, 3.)

believes to be "another scale with residue" packed in a box, and notebooks with "transaction" material.  (Ex. H at 10:50-11:00; 13:35-:44, 14:23-:26, 16:21-:25.)

Officer Timlin then begins rummaging through the trunk.  (Ex. G at 12:35-14:22.)  Inside a beige laundry bag, he sees what appears to be clear bags with an opaque substance, i.e., the vast majority of the methamphetamine at issue here. (Ex. G at 14:23-14:31; *see also* Ex. H at 14:35-:40.)  Officer Timlin also finds a black plastic bag where he discovers a single bullet. (Ex. G at 18:31-18:39, 18:59.)

Eighteen minutes into the stop, Officer Martinez calls dispatch to get Mr. Garcia's "RAPs," including any felony convictions. (Ex. H at 19:24-30.)  Then, Officer Martinez continues to search the car, pulling at panels in the doors, the center console, the steering wheel, and the radio.  (Ex. H at 21:30, 22:12-24:47, 26:00-28:57.)  He appears to pull out the stereo, and looks under the hood of the car, where he moves parts around, finding nothing.  (Ex. H at 24:00-24:57.)

Officer Timlin tells Mr. Garcia that unless he tells him "where the gun is," they will impound the vehicle and "destroy" it and will "rip it down to the frame."  (Ex. G-1 at 10-11.)  Mr. Garcia denies the existence of a gun in the car.  (*Id.*)  Officer Timlin continues searching, including the trunk, the rear passenger compartment, and the front right side passenger area.  (Ex. G, at 26:30-29:20.)  No gun is found.

## II.   THE ITEMS SEIZED FROM THE PROLONGED DETENTION, ILLEGAL FRISK AND MIRANDA VIOLATIONS SHOULD BE SUPPRESSED.

**A.   The government must prove that the warrantless detention of Mr. Garcia, the subsequent searches of Mr. Garcia, the car, and his wallet and satchel were constitutionally valid.**

The Fourth Amendment provides that the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated."  U.S. CONST. amend. IV.  The Fourth Amendment incorporates a strong preference for search warrants.  *See United States v. Ventresca*, 380 U.S. 102,

6

106 (1965).  While warrantless searches are not absolutely proscribed, the exceptions to the warrant requirement are "jealously and carefully drawn."  *Jones v. United States*, 357 U.S. 493, 499 (1958).

The government must show the reasonableness of a warrantless arrest and search. *See, e.g., United States v. Carbajal*, 956 F.2d 924, 930 (9th Cir. 1992).  If the government cannot satisfy this burden, all evidence recovered as a result of the search and arrest must be suppressed as the "fruit of the poisonous tree."  *Wong Sun v. United States*, 371 U.S. 471, 485-88 (1963).

Here, the officers had neither a search warrant nor an arrest warrant on July 2, 2021.  It is the government's burden to justify the warrantless searches and seizures. *See, e.g.*, *United States v. Huguez-Ibarra*, 954 F.2d 546, 551 (9th Cir. 1992).  The defense is not required to present any arguments in anticipation of the government's potential justifications for a warrantless search and seizure in its initial moving papers. Indeed, the Ninth Circuit has rejected such reasoning:

> [T]he Government appears to be arguing that the defendants must anticipate and rebut any conceivable theory that might have justified the searches.  This is not the law.  The Government bears the burden in cases of warrantless searches, and *at no time does it shift to the defendant*.

*United States v. Emens*, 649 F.2d 653, 657 n. 6 (9th Cir. 1980) (emphasis added).

Having demonstrated that a warrantless search and seizure occurred on July 2, 2021, the government must justify its warrantless conduct.  Nonetheless, the defense focuses here on specific searches and seizures, while reserving the right to respond further in any reply to the government's proffer.

1
2

**B.     Mr. Garcia was unlawfully detained, questioned, and searched in violation of the Fourth Amendment.**

3
4
5

**1.     The Officers exceeded the scope of a proper traffic stop when they seized Mr. Garcia, searched him, interrogated him, and investigated far beyond the scope of the minor traffic violations.**

6     During a traffic stop, an officer may order the driver to get out of the vehicle.

7   Whether the traffic stop's *duration* was reasonable, however, "is determined by the

8   seizure's 'mission'--to address the traffic violation that warranted the stop, and attend

9   to related safety concerns." *Rodriguez v. United States*, 135 S. Ct. 1609, 1614 (2015).

10  "Authority for the seizure thus ends when tasks tied to the traffic infraction are--or

11  reasonably should have been--completed." *Id.*  Such tasks include "checking the

12  driver's license, determining whether there are outstanding warrants against the driver,

13  and inspecting the automobile's registration and proof of insurance." *Id.* at 1615.

14  While an officer may "take certain negligibly burdensome precautions in order to

15  complete his mission safely" and perform "certain unrelated checks," the officer "may

16  not do so in a way that prolongs the stop, absent the reasonable suspicion ordinarily

17  demanded to justify detaining an individual." *Id.* at 1615–16.  Whenever a stop is

18  extended, there must be "independent reasonable suspicion justifying each

19  prolongation" of the seizure. *United States v. Evans*, 786 F.3d 779, 786 (9th Cir. 2015).

20    Officer Martinez reports that they pulled Mr. Garcia over because "the front

21  windows were tinted" and because he "made a wide illegal right turn." (Ex. A at 3.)

22  What proceeded--a full-scale criminal investigation and seizure that lasted at least 40

23  minutes--far exceeded the scope of that justification.

24    Although Officer Martinez told Mr. Garcia why he was pulled over when Mr.

25  Garcia asked, the Officers never bring up window tinting and improper turns with Mr.

26
27
28

8

Garcia again.[6]  Instead, within moments of pulling him over, Officer Timlin told Mr. Garcia to put out his cigarette and get out of the car.  When Mr. Garcia asked why, Officer Timlin told Mr. Garcia that he would tell him when he got out of the car.  (Ex. G-1 at 1.)  It was neither reasonable, nor necessary for the stated purpose of the stop, for Officer Timlin to ask Mr. Garcia out of the car and immediately restrain him.  (Ex. (Ex. G at 1:39-:43.)  Although he claimed to have seen "bongs and stuff," it was clear he believed those were marijuana bongs; right after he ordered Mr. Garcia out of the car, he asked "Just marijuana in the car?" (Ex. G at 1:28-:30; Ex. G-1 at 1.)  Mr. Garcia replied "No, I don't have no marijuana." (*Id.* at 1:31-:32.)  Officer Timlin retorted "No? You've got bongs and stuff." (*Id.* at 1:32-:33.)  Clearly, whatever he thought he saw, if anything, he thought it was marijuana paraphernalia.  But possession of marijuana paraphernalia is not a crime in California.  *See In re Johnny O*., 107 Cal. App. 4th 888, 897, 132 Cal. Rptr. 2d 471, 477 (2003) (concluding "that the possession of a device for smoking marijuana, without more, is not a crime in California").[7]

Their conduct thus went far beyond the tasks permitted under *Rodriguez*.  They did not check for his registration, or his insurance.  Instead of inquiring into the window tints, or why he made the alleged improper turn, Officer Timlin pulled Mr. Garica's hands behind his back, took his personal possessions from him, and with Officer Martinez, physically moved him to the curb.  There, Officer Timlin extensively searched and questioned Mr. Garcia.  He asked Mr. Garcia repeatedly if anything was going to hurt him, and never received an affirmative answer from Mr. Garcia.  (Ex. G-1

---

[6] At one point, after he has been arrested, Mr. Garcia asked Officer Martinez again for why he was pulled over.  Officer Martinez says "[w]hen you made that right hand turn, you didn't turn into the first lane.  You turned into the second lane."  Mr. Garcia said, "But you guys started following me since a while back, so."  (Ex. H-1 at 6.)

[7] In a recent unpublished decision, a Ninth Circuit panel concluded that the smell of burnt marijuana emanating from a van, among other facts, supported probable cause to infer that a violation of law had occurred, i.e., driving under the influence.  *See United States v. Vasquez*, No. 19-50275, 2021 WL 3011997, at *2 (9th Cir. July 15, 2021), *cert. denied,* 142 S. Ct. 502 (2021).  In contrast here, the Officers cited no evidence of any recent marijuana use to suggest that Mr. Garcia was driving under its influence, like an odor from burnt marijuana.

1  at 2-3.)  When he searched Mr. Garcia, he found no weapon.  (Ex. G at 02:10-:20.)

2  Undeterred, he asked Mr. Garcia if there was anything illegal on him.  (Ex. G-1 at 3.)

3       None of these questions related to the purpose of the stop.  All of this occurred

4  before they obtained the meth pipe.  Certainly, by then, they had exceeded the purpose

5  of the stop.  *See United States v. Cornejo*, 196 F. Supp. 3d 1137, 1150–54 (E.D. Cal.

6  2016) (finding that "questioning on unrelated topics" impermissibly "added time to the

7  traffic stop"); *United States v. Ward*, 2017 WL 1549474 (N.D. Cal. May 1, 2017)

8  (holding that officer's questions about probation status, whether motorist had anything

9  illegal in his possession, and consent to search the car were unrelated to the mission of

10  the stop); *see also Thomas*, 863 F.2d 622 (finding officer exceeded bounds of *Terry*

11  stop by frisking defendant and asking if he had any weapons after learning that he did

12  not match description of suspect, or appear armed and dangerous).

13       To be sure, the Officers eventually did *some* of the things one would expect in a

14  traffic stop, but long after they had unreasonably extended the stop already.  Although

15  Officer Martinez purported to look for Mr. Garcia's driver's license, that was after he

16  had improperly seized Mr. Garcia's wallet and satchel, and asked if there was

17  "[a]nything illegal in this stuff?".  Eventually, he gave Mr. Garcia's information to

18  dispatch.  (Ex. H at 5:21.)  Officer Martinez did not call to run a "RAPs" on Mr. Garcia

19  until 19 minutes into the stop, well after they had unlawfully seized him, searched him

20  and his belongings, cuffed him, and searched the car.  (Ex. H at 19:24).[8]

21       All evidence and statements obtained following this illegal detention therefore

22  must be suppressed under the exclusionary rule.  *Wong Sun*, 371 U.S. at 485-85; *United*

23  *States v. Morales*, 252 F.3d 1070, 1073 (9th Cir. 2001); *United States v. Chan-Jimenez*,

24  125 F.3d 1324, 1326 (9th Cir. 1997) (observing a Fourth Amendment "seizure occurs

25  when a law enforcement officer, by means of physical force or show of authority, in

26  some way restrains the liberty of a citizen").

27

28       [8] He did not follow up with dispatch for another 21 minutes after that inquiry, when he
apparently learned that Mr. Garcia had "no felony convictions" at that time.  (Ex. H at 41:35.)

### 2.   A *Terry* frisk was not justified because there was no reasonable suspicion that Mr. Garcia was armed or dangerous.

To justify a *Terry* frisk, there must be "reasonable suspicion that the person subjected to the frisk is armed and dangerous." *Arizona v. Johnson*, 555 U.S. 323, 327 (2009).  A frisk for weapons is "a serious intrusion upon the sanctity of the person, which may inflict great indignity and arouse strong resentment, and it is not to be undertaken lightly." *Terry v. Ohio*, 392 U.S. 1, 17 (1968).  The suspicion that a person is "armed and dangerous" must be individualized, and the officer must "set forth …'specific and articulable facts' such that a 'reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger.'" *United States v. I.E.V.*, 705 F.3d 430, 435 (9th Cir. 2012) (quoting *Terry*, 329 U.S. at 28).

No evidence suggested that Mr. Garcia was armed or dangerous.  He immediately and safely pulled over on a public street.  He rolled his windows down as ordered.  He did not appear agitated, angry, or nervous.  He calmly and coherently asked reasonable questions about why he was stopped and why Officer Timlin wanted him to step out of the car.  He did not protest when Officer Timlin said he would "tell [him] when [he got] out of the car." *See Ramirez v. City of Buena Park*, 560 F.3d 1012, 1022 (9th Cir. 2009) (noting, in concluding frisk was not warranted, that the suspect "complied with [the officer's] request that he exit his vehicle, and there is no evidence he did so in a furtive manner").  When Officer Timlin grabbed Mr. Garcia's hands and turned him around, he did not resist.  He made no furtive movements in or out of the car.  He remained calm as they detained him and escorted him to the curb. *See I.E.V.*, 705 F.3d at 435 (explaining how the defendant's "compliant and nonthreatening manner" weighed in favor of finding no reasonable suspicion).

Yet, at the curb, Officer Timlin immediately and repeatedly peppered Mr. Garcia with questions about what was in his pockets, including whether there was anything that was going to hurt him.  He ran his hands over Mr. Garcia's body, feeling through

11

the fabric of his shorts and pockets.  Mr. Garcia was in a tank top and shorts.  These could not easily conceal a weapon.

But-for the unjustified *Terry* frisk, these Officers would not have located the methamphetamine pipe.  Without that methamphetamine pipe, they would not have had cause to search the car, where they located cellular phones, the alleged indicia of drug sales, drug paraphernalia, and the methamphetamine at issue in the Indictment.  Nor would they have had cause to further question him, or search the rest of his belongings, including any cellular phones or contraband.  Because all of these items flow from the unjustified frisk, they should be suppressed.

### 3.     The Officers far exceeded the scope of any legitimate *Terry* frisk

These Officers also went far beyond the scope of a *Terry* frisk.  A *Terry* stop generally consists of "a brief stop, interrogation, and under proper circumstances, a brief check for weapons."  *United States v. Robertson*, 833 F.2d 777, 780 (9th Cir. 1987).  Put another way, "[a]n officer's seizure of contraband during a *Terry* search is constitutional if 'a police officer lawfully pats down a suspect's *outer clothing* and feels an object whose contour or mass makes its identity *immediately apparent. . . .*'" *United States v. I.E.V.*, 705 F.3d 430, 440 (9th Cir. 2012) (emphasis in original) (quoting *Minnesota v. Dickerson*, 508 U.S. 366, 375 (1993)).  "A search exceeds the proper scope if 'the incriminating character of [an item is] not immediately apparent' but is discovered 'only as a result of a further search. . . .'" *Id.* (alteration in original) (quoting *Dickerson*, 508 U.S. at 379).  If the *Terry* stop exceeds this limited intrusion, it becomes a de facto arrest, requiring probable cause.  *Id.*

These Officers exceeded the scope of a *Terry* frisk.  After inspecting Mr. Garcia and finding nothing, Officer Timlin should have stopped.  Instead, he continued to inspect Mr. Garcia's body in a manner far more intrusive than is permitted for a *Terry* frisk.  He still detected nothing.  Again, at that point, any proper *Terry* frisk was long complete.  Officer Timlin should have stopped.  He did not.  He asked Mr. Garcia if he could search him and again asked if there was anything on Mr. Garcia that would hurt

1   him.  To the latter, Mr. Garcia consistently reiterated, no.  That's when Officer Timlin

2   changed his approach, and asked, "Nothing illegal in here?" Mr. Garcia said there was

3   a stem.  (Ex. G at 2:10-:33).

4        This is not the purpose of a *Terry* frisk.  "The purpose of this limited search is

5   not to discover evidence of crime, but to allow the officer to pursue his investigation

6   without fear of violence[.]"  *Adams v. Williams*, 407 U.S. 143, 146 (1972); *see also*

7   *I.E.V.*, 705 F.3d at 432 (observing that a frisk is not valid if it is "a general exploratory

8   search motivated out of a desire to prevent the disappearance or destruction of evidence

9   of crime").  Plainly, Officer Timlin's mission in asking questions like, "Nothing illegal

10  in here?" was to find evidence of some other crime.  *See Rodriguez*, 135 S.Ct. at 1615

11  (noting that police conduct under the auspices of a *Terry* frisk is improper when it is

12  "aimed at detect[ing] evidence of ordinary criminal wrongdoing").

13       Because these Officers had no basis to conduct a *Terry* frisk of Mr. Garcia, and

14  nonetheless far exceeded the scope of such a frisk, all evidence flowing from that

15  improper frisk must be suppressed.

16  **C.    The Officers Unlawfully searched Mr. Garcia's car**

17       The search of Mr. Garcia's car was also unlawful, and the proceeds of that

18  search, including the methamphetamine seized from the trunk and the rest of the car,

19  scales, purported "pay/owe" sheets, pipes, cash, phones, and any other fruits or

20  subsequent fruits of that search, must be suppressed.  It makes no difference that Mr.

21  Garcia said "go for it" when Officer Timlin asked to search the car.  (Ex. G at 4:47; Ex.

22  G-1 at 6.)  First, that request and any purported consent was tainted by the unlawful

23  seizure and frisk of Mr. Garcia.  Second, any purported consent was involuntary.

24           **1.    The Officers would have had no occasion to search Mr. Garcia's**

25                **car but-for their earlier constitutional violations.**

26       Officer Timlin's request came on the heels of the unlawful seizure of Mr. Garcia,

27  the unlawful *Terry* frisk, and the unlawful seizure of the pipe.  But-for these

28  constitutional violations, Officer Timlin would have had no occasion or reason to

13

search the car.  *See United States v. Landeros*, 913 F.3d 862, 870 (9th Cir. 2019) ("The officers discovered the bullets Landeros was convicted of possessing only because he was ordered from the car as part of the unlawfully extended seizure and subsequently consented to a search of his pocket.").

Indeed, any evidence obtained as a result of an "illegal investigation is tainted by the illegality and thus inadmissible, notwithstanding . . . consent." *Chavez-Valenzuela*, 268 F.3d at 727.  Three factors are examined to determine whether prior illegality taints subsequent consent: (1) the "temporal proximity between illegality and consent;" (2) "the presence of intervening circumstances;" and (3) "the purpose and flagrancy of the official misconduct." *Brown v. Illinois*, 422 U.S. 590, 603-04 (1975); *United States v. Washington*, 490 F.3d 765, 776-77 (9th Cir. 2007).

Each factor weighs heavily in finding that any consent here was tainted.  Less than three minutes passed between the request to search the car and the unlawful seizure, *Terry* frisk, and search of Mr. Garcia.  (*See* Ex. G at 01:39-01:58, 04:41-04:47.)  By then, Officer Timlin had already conducted an illegal frisk, illegally searched Mr. Garcia, placed him in handcuffs, and ordered him to sit down on the curb. (Ex. G at 01:39-01:58-3:45.)  Meanwhile, Officer Martinez had begun to interrogate him without the benefit of *Miranda* warnings, and unlawfully seized his belongings (both discussed below).  These were not "intervening circumstances," but the continued escalation of an already illegal and flagrant fishing expedition.  Any purported consent was also thus contemporaneous with the illegality.  *Washington,* 490 F.3d at 777 (when consent occurred during illegal seizure, there is no applicable time lapse or intervening circumstance).

The third factor similarly weighs toward suppression because, as described herein, these Officers engaged in multiple constitutional violations, beginning with the immediate restraint of Mr. Garcia.  Their decision to then search him, the car and his belongings amounted to "a fishing expedition in the hope that something illegal might turn up." *Washington,* 490 F.3d at 777.

### 2.     Mr. Garcia did not give valid consent to search his car

Regardless, any consent from Mr. Garcia to search the car was invalid. Although the government bears the burden of showing any consent was voluntary, it is clear enough that any consent here was not.  *See United States v. Mendenhall*, 446 U.S. 544, 557–58 (1990) (observing that the government has the burden of proving that person's consent is on the government) (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 222 (1973)).

Consent to a warrantless search and seizure must be "unequivocal and specific and freely and intelligently given.  There must be convincing evidence that [a] defendant has waived his rights.  There must be clear and positive testimony." *United States v. Shaibu*, 920 F.2d 1423, 1426 (9th Cir. 1990) (internal citations omitted); *United States v. Chan-Jimenez,* 125 F.3d 1324, 1327 (9th Cir. 1997) (observing that the government must prove "that the consent was freely and voluntarily given" to rely on consent as a justification for a warrantless search") (citation omitted).

Consent is not voluntary, though, if given only in acquiescence to a claim of lawful authority.  *See, e.g.*, *United States v. Stephens*, 206 F.3d 914, 917-18 (9th Cir. 2000) (consent to search not voluntary where officers advised bus passengers that they were "free to leave" the bus but "did not tell passengers that they were free to remain on the bus and terminate the encounter by declining to answer their questions").

The voluntariness of consent is assessed by looking at five factors: "(1) whether the person was in custody; (2) whether the officers had their guns drawn; (3) whether a *Miranda* warning had been given; (4) whether the person was told that he had the right not to consent; and (5) whether the person was told that a search warrant could be obtained." *United States v. Washington*, 490 F.3d 765, 775 (9th Cir. 2007).  No one factor is determinative in the equation.  *See United States v. Castillo*, 866 F.2d 1071, 1082 (9th Cir. 1989).  Although it is not necessary to check off all five factors, "many of this court's decisions upholding consent as voluntary are supported by at least several of the factors." *Chan-Jimenez*, 125 F.3d at 1327 n. 3.

Here, these factors, taken as a whole and considering the purposes behind them, render any purported consent involuntary. When Officer Timlin asked Mr. Garcia if he could search the car, Mr. Garcia was in custody. "If the person reasonably believes that he cannot leave freely, he is considered in custody[.]" *United States v. Curtis*, 568 F.2d 643, 646 (9th Cir. 1978). Within seconds of approaching his front window, the Officer asked Mr. Garcia out of the car. When he asked why, Officer Timlin did not tell him. Instead he told him, "I'll tell you when you get out of the car." (Ex. G-1 at 1).

By then, Officer Timlin had exerted the kind of authority that an ordinary person would not feel empowered to refuse. Indeed, Mr. Garcia exited the vehicle. At that time, he still had his wallet and satchel on him, and although Officer Timlin told him he could "leave that stuff here," Officer Timlin actually took his wallet and gave it to Officer Martinez. (Ex. G at 1:44-1:46.) Then, Officer Timlin pulled Mr. Garcia's hands behind his back and, with Officer Martinez flanking them, took Mr. Garcia to the curb. (Ex. G at 1:46-1:50.) At no point did Officer Timlin tell Mr. Garcia why he was taken out of the car, thus confirming to Mr. Garcia that this was not an arms-length interaction; Mr. Garcia would do what he was told, and the Officers did not need to provide an explanation.

At the curb, the Officers removed the satchel from Mr. Garcia. (Ex. G at 2:00-:10.) Officer Timlin then conducted his unlawful *Terry* frisk, discussed above. Surrounded by two officers--one of whom was searching his body--with his personal items already seized, and his hands behind his back, Mr. Garcia could not have reasonably believed that he could leave. After they learned of the methamphetamine pipe, he was handcuffed and ordered to sit on a ledge deeper within the curb, farther recessed from the street. Officer Timlin had also ordered him to cross his feet. Although their guns were not drawn, the Officers were armed and in full uniform.

By that point, the Officers had already exerted their authority upon Mr. Garcia to the point that a reasonable person in his position would not feel like he had any choice other than to comply. They did not *Mirandize* him at this point, he was never told that

16

he had the right *not* to consent, they said nothing to him about the need for a warrant, or that a search warrant could be obtained.  No person would reasonably believe they were free to leave.  Any consent to search the car was not voluntary.

**D.      The Officers Unlawfully Seized and Searched Mr. Garcia's Belongings.**

      **1.      The Officers had no legal basis to seize and search Mr. Garcia's Wallet and Satchel.**

While Officer Timlin was improperly frisking and questioning Mr. Garcia, Officer Martinez had taken Mr. Garcia's wallet and satchel.  Mr. Garcia had a reasonable expectation of privacy in these items.  *See Aquino v. Cnty. of Monterey Sheriff's Dept*., 2016 WL 5946867, \*9 (N.D. Cal. Sept. 29, 2016) ("As an initial matter, the court recognizes that Plaintiff had a reasonable expectation of privacy in the contents of his wallet") (citing *United States v. Monclavo-Cruz*, 662 F.2d 1285, 1290-91 (9th Cir. 1981) (concluding the individual's "expectation of privacy in her purse was one that society recognizes as reasonable")); *United States v. Davis*, 332 F.3d 1163, 1170 (9th Cir. 2003) (finding the defendant had a reasonable expectation of privacy in his gym bag)).  Officer Martinez had no warrant for Mr. Garcia's belongings, rendering his seizure and subsequent search of them unreasonable.

Officers might be permitted to *ask* for identification during a lawful traffic stop, but Officer Martinez did more than that.[9]  While Officer Timlin was improperly

---

[9]      At least one district court in the Ninth Circuit permitted law enforcement to search a wallet for identification when the individual refused to produce identification. *See Wofford v. Bracks*, CV 15-1052-GW (SP), 2016 WL 8732178, at \*10 (C.D. Cal. Jul. 26, 2016) (finding metro officers' search of passenger's backpack was not improper because they had a reasonable basis to suspect he had not paid his fair--the infraction at issue--and had refused to cooperate with their requests, including for identification).

This case is distinguishable because Mr. Garcia never refused to produce identification, and had complied with their requests.  In other cases dealing with the search of wallets, courts have found that law enforcement acted improperly.  *See Aquino v. County of Monterey Sheriff's Dep't*, CV 14-003387-EJD, 2016 WL 5946867,

frisking Mr. Garcia, Officer Martinez asked about Mr. Garcia's wallet and satchel--
"Anything illegal in this stuff?" (Ex. H-1 at 2).

There was no basis for Officer Martinez to ask this question, or further deprive
Mr. Garcia of his personal property. There was yet no reasonable suspicion of an
independent offense, let alone probable cause of one. Regardless, Mr. Garcia replied
no. That should have been the end of it. By continuing to seize the satchel, and then
search it, Officer Martinez violated Mr. Garcia's Fourth Amendment rights with regard
to these items. The proceeds of those searches, including the cocaine located in the
satchel and any statements Mr. Garcia made, should be suppressed.

## 2. The unlawful *Terry* frisk tainted any purported consent to search his belongings, and any consent was involuntary.

After the seizure of his belongings should have ended, Officer Martinez tried a
different approach by asking "can I check?" Officer Martinez did not tell Mr. Garcia
that he could say no, and at this point, he had not *Mirandized* Mr. Garcia. Mr. Garcia
said "go for it." (Ex. H at 02:12-02:13.)

---

at *9-10, (N.D. Cal. Sept. 26, 2016) (observing right to privacy in wallets and finding
warrantless search of person's wallet was unjustified under plain view doctrine); *United
States v. Collier*, CR 13-19 JGB, 2015 WL 11123302, at *9 (C.D. Cal. Nov. 10, 2015)
(finding search of wallet amidst traffic stop did not fall within the "automobile
exception" because the wallet was outside of the vehicle and thus no longer had the
"inherent mobility" concerns that vehicles have, and the search "was not a search
incident to arrest" because it was not "spatially and temporally incident to the arrest"
(quotations and citations omitted)).

Looking at these same cases, the court in *United States v. Phan*, CR 18-719 DSF,
noted the absence of "Supreme Court or Ninth Circuit authority concerning the search
of a wallet in these circumstances," but also acknowledged one circuit and court that do
permit such searches. *Phan*, CR 18-719 DSF, Order Denying in Part Mot. to Supp.,
ECF No. 34, p. 13 n.8 (Aug. 13, 2019). Nonetheless, the court in *Phan* found that the
search of Mr. Phan's wallet was unlawful where "[t]here was no indication that Mr.
Phan would not have provided his identification if handed the wallet," and his earlier
delay in attempting to retrieve it did not permit the search of his wallet. *Id.*

Like any purported consent to search the car, that exchange did not transform what began as an unlawful seizure into a lawful one.  *See Landeros*, 913 F.3d at 870. For the same reasons that any such consent to search the car was tainted by the illegal *Terry* stop and frisk, (discussed above) any consent to search his belongings was tainted, too.  *See Washington,* 490 F.3d at 777.  That Mr. Garcia said "go for it" did not qualify as valid consent, either.  Again, for the same reasons Mr. Garcia's purported consent to search the car was involuntary, uttering "go for it" was involuntary, too.

**E.    Mr. Garcia was interrogated in violation of his Fifth Amendment rights.**

Officer Martinez did not read Mr. Garcia his *Miranda* rights until 7 minutes into their interaction, 5 minutes after he was already hand-cuffed, and after he and Officer Timlin had started to interrogate him.  (Ex. H-1 at 7-8.)   However, a suspect subject to custodial interrogation must receive valid *Miranda* warnings *before* an interrogation. *Miranda v. Arizona*, 384 U.S. 436, 444 (1966); *see also Illinois v. Perkins*, 496 U.S. 292, 207 (1990); *J.D.B. v. North Carolina*, 564 U.S. 261, 269-270 (2011).  The government must demonstrate valid *Miranda* warnings were given prior to a custodial interrogation.  *United States v. Harrison*, 34 F.3d 866, 890 (9th Cir. 1994).

In determining whether an individual was in custody, the court "must determine whether the officers established a setting from which a reasonable person would believe that he or she was not free to leave."  *United States v. Kim*, 292 F.3d 969, 973-74 (9th Cir. 2002); *see also Thompson v. Keohane*, 516 U.S. 99, 112 (1995) ("Two discrete inquiries are essential to the determination: first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was at liberty to terminate the interrogation and leave.") (internal quotation marks and citation omitted).

As stated above regarding the improper searches of Mr. Garcia's belongings and car, a reasonable person in his position would not have felt free to leave.  Yet he did not receive his *Miranda* warnings until long after he was in custody, and after they had begun interrogating him.  Interrogation is "express questioning" or other activity by law

19

1   enforcement officers "reasonably likely to elicit an incriminating response." *Rhode*
2   *Island v. Innis*, 446 U.S. 291, 300-01 (1980).

3       Specifically, Officers Martinez and Timlin asked Mr. Garcia questions like
4   whether he had anything illegal on his person or in his belongings (Ex. G-1 at 1-3);
5   whether Mr. Garcia was on probation or parole (*id.* at 5);  when was the last time he
6   was arrested (*id.*); if there is anything "crazy" in the car (*id.* at 6); regarding the car
7   "Oh, so there might be some stuff in there that doesn't belong to you?" (*id.*); "How
8   long have you been using?" (Ex. H-1 at 6); "Is this your car?"  (*id.*); "And who's your
9   friend there at the hotel?" (*id.* at 7).

10      Mr. Garcia's statements until he was read his *Miranda* rights were taken in
11  violation of *Miranda* and must be suppressed.  *Miranda*, 384 U.S. at 479.

12  **F.    The proceeds of the unlawful searches and seizures, and the fruit of**
13  **        those proceeds, must be excluded.**

14      The Fourth Amendment requires not only the exclusion of all evidence directly
15  obtained through its violation, but also the exclusion of all fruits thereof. *Wong Sun*,
16  371 U.S. at 484-87. Therefore, the Supreme Court has held that "verbal evidence which
17  derives so immediately from an unlawful entry is no less the fruit of official illegality
18  than the more common tangible fruits of the unwarranted intrusion." *Id*. at 485.

19      The Officers' seizure of evidence from Mr. Garcia, his wallet and satchel, the
20  car, and any of Mr. Garcia's statements, flowed from the constitutional violations
21  described above.  They must all be suppressed either as the "common tangible fruits" of
22  these constitutional violations, or as the fruit of them.  *Id.* at 485, 488.

23  **III.   THE CELL PHONES SHOULD BE SUPPRESSED BECAUSE THE**
24  **        AGENT OBTAINED THEM THROUGH PROHIBITED GENERAL**
25  **        SEARCH WARRANTS.**

26      Based on the proceeds of the traffic stop, local police obtained a search warrant
27  for two of the phones--those located in Mr. Garcia's satchel.  That search warrant was

28                                          20

limited in timeframe from June 1, 2021 to the date of the offense, July 2, 2021. (Ex. L at USAO_72.) Two federal search warrants were also obtained.

The first federal warrant was issued on July 12, 2021 based on an Affidavit submitted by DEA Special Agent Christopher Sinclair (hereinafter, "Warrant #1"). The warrant included two attachments, A and B, which set forth the devices to be searched, and the "search procedure" for those devices. (Warrant #1, Ex. J at USAO 153-55.) Warrant #1 authorized the search of all four cellular phones seized during the July 2, 2021 stop, including the two found under the car seat: a red iPhone 11, a red iPhone 8, a black ZTE-AWE cell phone, and a black TCL-LX cell phone. (Ex. J at USAO 154.)

Warrant #1 was used to search for evidence of drug trafficking. (*Id.* at USAO 153.) During that search, the agent "discovered photographs of a firearm, including a photograph of a person holding a firearm in front of what appears to be the vehicle GARCIA was driving at his July 2, 2021 traffic stop, when officers discovered approximately 25 pounds of suspected methamphetamine in the trunk of GARCIA's vehicle." (Ex. K, Warrant #2 at USAO_206.)[10] Based on this discovery in executing Warrant #1 for drug trafficking, the agent sought Warrant #2 for evidence of firearm possession. (Ex. K, at USAO_188.)

**A.     Even if the warrants stated some degree of probable cause, they were so unparticularized and overbroad that they became general warrants because they allowed the government to search the entire phones without any limits to their discretion.**

These warrants were so unparticularized and overbroad that they amounted to general warrants. General warrants are "specially prohibited by the Fourth

---

[10] As referenced in the concurrently filed Motion to Compel, the undersigned has repeatedly asked the government to identify and produce this image. As of the date of this filing, the government has not produced it. Depending on the results of the Motion to Compel, or any other subsequent production from the government, the undersigned reserves the right to supplement this Motion to Suppress to argue that the image referenced in this portion of Warrant #2 is materially different from how it was described to the magistrate, and would request a hearing under *Franks v. Delaware*, 438 U.S. 154 (1978).

1  Amendment." *Andresen v. Maryland*, 427 U.S. 463, 480 (1976).  The Fourth
2  Amendment's particularity requirement was designed to prevent the evils of general
3  warrants from colonial times.  *Virginia v. Moore,* 553 U.S. 164, 169, 128 S.Ct. 1598,
4  170 L.Ed.2d 559 (2008).

5      A general warrant describes the places to be searched and the things to be seized
6  in such vague terms that it invites "'exploratory rummaging in a person's belongings.'"
7  *Andresen*, 427 U.S. at 480 (quoting *Coolidge v. New Hampshire*, 403 U.S. 443, 467
8  (1971)).  To determine if a warrant is sufficiently specific, courts examine "both the
9  warrant's breadth and particularity." *Wong*, 334 F.3d at 836.  "Specificity has two
10 aspects: particularity and breadth.  Particularity is the requirement that the warrant must
11 clearly state what is sought.  Breadth deals with the requirement that the scope of the
12 warrant be limited by the probable cause on which the warrant is based." *United States
13 v. Hill*, 459 F.3d 966, 973 (9th Cir. 2006) (citing *United States v. Towne*, 997 F.2d 537,
14 544 (9th Cir. 1993)).

15     "[A] warrant is particularly susceptible to being overbroad when it authorizes the
16 search and seizure of electronically-stored information," also called "ESI." *United
17 States v. Roberts*, 430 F. Supp. 3d 693, 716–18 (D. Nev. 2019), *appeal dismissed,* No.
18 20-10026, 2020 WL 1952501 (9th Cir. Mar. 18, 2020) (citing *United States v. Flores*,
19 802 F.3d 1028, 1044–45 (9th Cir. 2015)).  "The Supreme Court, too, has emphasized
20 recently the ability of digital troves to contain '[t]he sum of an individual's private life,'
21 and the corresponding need for our jurisprudence to reflect the changing technological
22 landscape." *In re Grand Jury Subpoena, JK-15-029*, 828 F.3d 1083, 1089–90 (9th Cir.
23 2016) (quoting *Riley v. California*, 573 U.S. 373, 134 S.Ct. 2473, 2489, 189 L.Ed.2d
24 430 (2014)).

25     In *Riley*, the Supreme Court addressed warrantless searches of cell phones seized
26 during an arrest.  The Court observed how "[c]ell phones differ in both a quantitative
27 and a qualitative sense from other objects that might be kept on an arrestee's person."
28 *Riley*, 573 U.S. at 393.  Because of their massive storage capacity, "the sum of an

individual's private life can be reconstructed through a thousand photographs labeled with dates, locations, and descriptions; the same cannot be said of a photograph or two of loved ones tucked into a wallet." *Id.* Unlike other kinds of evidence, "data on a phone can date back to the purchase of the phone, or even earlier." *Id.* at 394. For example, "[a] person might carry in his pocket a slip of paper reminding him to call Mr. Jones; he would not carry a record of all his communications with Mr. Jones for the past several months, as would routinely be kept on a phone." *Id.* at 394-95.

The Court noted the difference that access to such troves of data could have for law enforcement: "A decade ago police officers searching an arrestee might have occasionally stumbled across a highly personal item such as a diary." *Id.* at 395 (citation omitted). "Today, by contrast, it is no exaggeration to say that many of the more than 90% of American adults who own a cell phone keep on their person a digital record of nearly every aspect of their lives—from the mundane to the intimate." *Id.* (citation omitted.) Thus, "[a]llowing the police to scrutinize such records on a routine basis is quite different from allowing them to search a personal item or two in the occasional case." *Id.*

To be sure, there are unique challenges to searching ESI. The Ninth Circuit has recognized that "[b]y necessity, government efforts to locate particular files will require examining a great many other files to exclude the possibility that the sought-after data are concealed there." *United States v. Comprehensive Drug Testing, Inc.*, 621 F.3d 1162, 1176 (9th Cir. 2010) (en banc) (per curiam), *overruled in part on other grounds as recognized by Demaree v. Pederson*, 887 F.3d 870, 876 (9th Cir. 2018). This kind of "'over-seizing'" has become "an accepted reality in electronic searching because '[t]here is no way to be sure exactly what an electronic file contains without somehow examining its contents.'" *U.S. v. Flores*, 802 F.3d 1028, 1044-45 (9th Cir. 2015).

However, as other courts have begun to recognize, "[t]hat 'accepted reality' has evolved." *Matter of Search of Info. Associated With Four Redacted Gmail Accts.*, 371 F. Supp. 3d 843, 844–46 (D. Or. 2018) (finding application to search email accounts

23

"overbroad because it is unreasonable to compel a provider to disclose every email in its client's account when the provider is able to disclose only those emails the government has probable cause to search" by limiting the search to relevant times); *see also Matter of the Search of Info. Associated with [redacted]@mac.comthat is Stored at Premises Controlled by Apple, Inc.*, 25 F. Supp. 3d 1, 7 (D.D.C. 2014) (criticizing the government's repeated habit of "submit[ting] overly broad warrants" where, even using the "two-step" process to seize and then search, "the seizure of a potentially massive amount of data without probable cause has still occurred—and the end result is that the government has in its possession information to which it has no right").

In *United States v. Roberts*, 430 F. Supp. 3d 693, 716–18 (D. Nev. 2019), *appeal dismissed,* No. 20-10026, 2020 WL 1952501 (9th Cir. Mar. 18, 2020), the court suppressed the contents of a defendant's phone, in part, because the warrant "lack[ed] procedural safeguards to prevent the seizure and retention of information outside the scope of related criminal activity." 430 F. Supp. 3d at 717. The warrant contained "no standards for its execution, such as providing search methodology for segregating non-responsive information." *Roberts*, 430 F. Supp. 3d at 717. "The absence of more definite limitations, both in timeframe and methodology, raises great due process concerns given that '[w]ith all that they contain and all they may reveal, [cell phones] hold for many Americans the privacies of life.'" *Id.* (quoting *Riley*, 573 U.S. at 403) (internal quotes omitted).

The warrants here were similarly so overbroad, unparticularized, and without any meaningful limitations that they amounted to general warrants.[11] The Ninth Circuit considers three factors in determining if a warrant is impermissibly overbroad:

> (1) whether probable cause existed to seize all items of a category described in the warrant; (2) whether the warrant set forth objective standards by which executing officers could

---

[11] Because the language at issue in both warrants is substantially the same, this analysis addresses both at the same time, unless otherwise noted.

24

differentiate items subject to seizure from those which were

not; and (3) whether the government could have described the

items more particularly in light of the information available.

*United States v. Flores*, 802 F.3d 1028, 1044 (9th Cir. 2015) (quoting *United States v. Lei Shi*, 525 F.3d 709, 731-32 (9th Cir. 2008)).

Warrants #1 and #2 did not furnish probable cause to search for *all* of the items described therein.   In enumerating the "items to be seized," Attachment B describes virtually the whole universe of data that could be found on a cellphone.  This includes (1) call log information, "all telephone numbers," and "all received or missed incoming calls," (2) "SMS text, email communications, or other text or written communications sent to or received from any of the digital devices and which related to" the allegations, and (3) an array of instant messaging and social media applications like Facebook, Facebook Messenger, Snapchat, and Whatsapp, as well as pictures, video recordings, calendars, and GPS coordinates.  (Ex. J at USAO 155-157; Ex. K at USAO 188-90.).  Attachment B contained no temporal limit for any of these items, or offered any evidence specific to Mr. Garcia that suggested he used any or all of these items to commit the alleged offense.

In another instructive case, *United States v. Lofstead,* No. 20-CR-00053 (MMD) WGC, 2021 WL 5501101, at *7 (D. Nev. Nov. 22, 2021),[12] the court suppressed the contents of a defendant's phone, in part, because the warrant contained no meaningful limits.  There, the warrant sought virtually all materials on the phone even though the government knew of specific dates at issue.  *Lofstead*, 2021 WL 5501101, at *7 (D. Nev. Nov. 22, 2021).  "Although the items listed in the Warrant are not exactly vague, they are so numerous and unspecific to create an unrestricted 'dragnet' search." *Lofstead*, 2021 WL 5501101, at *7 (citing *Flores*, 802 F.3d at 1045).  The

---

[12] On December 22, 2021, the government in *Lofstead* filed its notice of appeal of the court's orders granting the motions to suppress and dismiss. *Lofstead,* No. 20-CR-00053 (MMD) WGC, ECF No. 45 (D. Nev. Dec. 22, 2021)

court there analyzed "Item 1," a portion of the search warrant which allowed the government "to search for '[a]ny and all records and materials that may be found within [the phone], in any format and media (including, but not limited to; images videos, e-mails, chat logs, text messages, instant messages and electronic messages), pertaining to the Target Offenses.'" *Id.*

Although stated differently than "Item 1" in *Lofstead*, these Warrants authorized a similarly comprehensive scope:  images, videos, emails, chat logs, texts, instant messages, and even more. [13]  (Ex. J at USAO 155-157; Ex. K at USAO 188-90.)  Even more, Attachment B allows the government to seek the "absence" of items like this. (Ex. J at USAO _155; Ex. K at USAO_188.)  How does the absence of any of these items make it more likely that the offenses occurred?  At the same time, permitting the government to search for the "absence" of something means that it can search *everything.*  This is not particular at all.

The government could have more explicitly tailored the search warrant to items that were actually relevant.  In fact, one paragraph in Attachment B shows that the government knew exactly how to do that where it sought

> Records, documents, programs, applications, materials, or conversations relating to the trafficking of drugs, including ledgers, pay/owe records, distribution or customer lists, correspondence, receipts, records, and documents noting price, quantities, and/or times when drugs were bought, sold, or otherwise distributed[.]

(Ex. J at USAO 156.)

But the rest of the warrants' broad, vague categories swallowed any of these limitations, giving no meaningful limits as to how they searched the phone.

---

[13]   In *Lofstead*, the court was also concerned with the search warrant's scope with regard to remote data storage and access to that storage.  *Lofstead*, 2021 WL 5501101, at *7.

26

And without time limits, the government could access *all* of this sensitive data--emails, messages, photographs, intimate communiques--from *years* ago without citing evidence to believe that a crime was committed so long ago.  In *Lofstead,* the court acknowledged that "[t]he Ninth Circuit has not definitely resolved whether a complete lack of temporal limitation on searches for ESI are facially overbroad."  2021 WL 5501101, at *7 (D. Nev. Nov. 22, 2021) (citing *Flores*, 802 F.3d at 1045).  Still, although "[t]emporal restrictions are not a de facto requirement, . . . courts that have allowed warrants without temporal limitations have reasoned the limitation would have served no limiting purpose."  *Id.*  (citing *United States v. Johnson*, Case No. 6:14-cr-00482-MC, 2018 WL 934606, at *2 (D. Or. Feb. 16, 2018); *United States v. Sam*, Case No. CR19-0115-JCC, 2020 WL 2131285, at *3 (W.D. Wash. May 5, 2020)).

Here, there *was* a limiting purpose in having a time restriction.  The government here seized *four* phones, two of which were apparently not even operable at the time of the arrest.  However, the government had evidence of an alleged drug offense that occurred on July 2, 2021.  If the cellular phones were to contain evidence of that offense, then, it would be relatively close to that time.  The government knew that it could have sought this limitation.  The search warrant application submitted by local law enforcement included a temporal limit from June 1, 2021 to July 2, 2021.  (Ex. L at USAO_72.)  The Affiant here was evidently aware of this State Search Warrant because the Affiant referenced it in Warrant #1.  (Ex. J at USAO_168.)  Without any limit reasonably tied to that date, the government can sift through these cellular phones for virtually anything captured from years ago.

These warrants also failed to set forth sufficient, objective standards to differentiate between responsive and non-responsive items.  After describing the "Items to be Seized," Attachment B describes the "search procedure" for the cellular phones.  On how the government will actually conduct the search, Attachment B asserts that "[t]he search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant."  (Ex. J at

USAO_158.)  There was no process for segregating responsive items from non-responsive items; no taint team, no search terms, no further explanation of what "search protocol" agents will create.  It does not describe who will choose those protocols, what they will consist of, what programs will be deployed, or whether it is even possible to create a search protocol that can "identify only the specific items to be seized[.]"  (Ex. J at USAO_158.)

Amid several requests about what that "search protocol" actually entails, the government recently provided some explanation as to what "search protocols" are being used.  (*See* Mot. to Compel, Ex. E at 3-4, incorporated by reference here)  At bottom, it appears the government is reviewing the phones in their entirety, and has no real search protocol at all.  Instead, per the government's response, the "search team's protocol at present is to review the totality of the phones unless and until it determines an alternative protocol becomes necessary to focus on the specific items to be seized." (*Id.* at 3.)  For example, they are not using keyword searches, and when it comes to images, they are simply "viewing the thumbnails of all of the images on the devices, ignoring those that are outside the scope of the warrants, and seizing the images that are within the scope by using tools on Cellebrite that enable to government to save seized image files to a folder on a computer."  As for communications, they are "reviewing all communications and saving those files that are within the scope of the warrants to a computer folder." They are using no "automated tools or methods to exclude materials" non-responsive to the warrants.  (*Id.* at 3-4.)

Although the government assures that "[t]he team is not seizing items that are outside the scope of the warrants," this misses the point.  (*Id.* at 4.)  Everything on the phones has already been seized--every intimate chat, family photograph, embarrassing piece of browser history, the thousands of private bits of information that make up a life.  To assure the magistrates here that there would be no unnecessary over-seizure of items, the government said it would "conduct the search only by using protocols specifically chosen to identify only the specific items to be seized under this warrant."

This most minimal safeguard left the discretion on what "search protocol" meant entirely to the government.  But it at least suggested that there would be *some* sort of system or method to minimize over-seizure.  What the government describes, however, amounts simply to "eyeballing" everything, without even a time limitation.  That the government then used this access to obtain a second warrant for an entirely *new* crime-- and yet cannot even identify the photograph they purportedly found--demonstrates exactly why these limitless warrants are problematic.

Because the scope of these warrants is so sweeping, their apparently limitless bounds allowed the government to rummage through these phones to look for evidence without sufficient cause.  Their proceeds should be suppressed.

## I.    CONCLUSION

Over and over, these Officers violated Mr. Garcia's constitutional rights.  They seized him without cause and questioned him without the required warnings.  They searched his belongings without a legal basis.  They exploited these violations to gather incriminating evidence against him.  Then, through incredibly broad and unparticularized search warrants, the government gained unjustified but unfettered access to his cellular phones to find more incriminating evidence against him.  The proceeds of the illegal search, seizure, and these general warrants, must be suppressed.

Respectfully submitted,

CUAUHTEMOC ORTEGA
Federal Public Defender

DATED:  January 3, 2022          By  */s/ Erin Murphy*

ERIN MURPHY
FERMIN C. VARGAS
Deputy Federal Public Defenders
Attorneys for DANIEL GARCIA

29